[No. 73406-7-I.  Division One.  December 27, 2016.]

FRANK BUCCI, *Appellant*, v. NORTHWEST TRUSTEE SERVICES, INC., ET AL., *Respondents*.

*Joshua B. Trumbull* and *Emily A. Harris* (of *JBT & Associates*), for appellant.

*Joshua S. Schaer* (of *RCO Legal PS*), for respondents RCO Legal PS and Northwest Trustee Services.

*Fred B. Burnside, Hugh R. McCullough,* and *Zana Z. Bugaighis* (of *Davis Wright Tremaine LLP*), for respondent JPMorgan Chase Bank National Association.

*John E. Glowney* and *Vanessa S. Power* (of *Stoel Rives LLP*), for respondents U.S. Bank National Association and Select Portfolio Servicing Inc.

¶1  MANN, J. — In 2009, Frank Bucci defaulted on a $1.53 million promissory note secured by a deed of trust on his home. In 2013, U.S. Bank National Association as trustee

(USB), the current beneficiary and holder of Bucci's promissory note, initiated nonjudicial foreclosure proceedings. Bucci responded by filing an action for declaratory and injunctive relief seeking to enjoin the nonjudicial foreclosure. Bucci's action included claims under the Consumer Protection Act, ch. 19.86 RCW, and for negligence against USB; Select Portfolio Servicing Inc. (SPS), the current loan servicer; JPMorgan Chase Bank National Association (Chase), the previous beneficiary of Bucci's promissory note; Northwest Trustee Services (NWTS), the trustee; and RCO Legal PS, NWTS's law firm. The trial court dismissed Bucci's action on the respondents' motions for summary judgment. In the published portion of this decision, we conclude that the note was negotiable and properly admitted; we therefore affirm the dismissal of claims against USB and SPS. In the unpublished portion of this decision, we affirm the trial court's dismissal of all other claims.

## *FACTS*

## I

¶2 In May 2007, Frank Bucci received a $1.53 million refinance loan from Washington Mutual Bank FA and signed an adjustable rate note as evidence of his obligation to repay the loan. To secure repayment of the debt, Bucci granted Washington Mutual a deed of trust encumbering his personal home and property located on the Reserve at Newcastle golf course in Washington.

¶3 The note and deed contain several key provisions relevant to this appeal. At the outset, the note explained that changes in the interest rate may result in an increase in the principal:

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE

THAN 115% OF THE ORIGINAL AMOUNT (OR $1,759,500.00). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

¶4 Section 1 of the note contains Bucci's promise to pay $1.53 million "plus any amounts added in accordance with Section 4(G) below, (this amount is called 'Principal'), plus interest, to the order of the Lender."

¶5 Section 4 of the note is titled "Interest Rate and Monthly Payment Changes." Subsections 4(A) through (C) explain that the interest rate charged is subject to change on a monthly basis and determined by adding 2.5 percentage points to the "index"—a 12-month average of the annual yields of United States Treasury Securities. Subsection 4(D) caps the interest rate at 9.7 percent.

¶6 Under the note, Bucci's payments are also subject to change. Subsection 4(E) explains that unlike the interest rate that can change monthly, Bucci's monthly payments are calculated once a year. Bucci pays the amount set on July 1st each month for 12 months until the monthly payments are recalculated on July 1st of the following year. Bucci's monthly payment is the "monthly payment that would be sufficient to repay the projected principal balance [Bucci is] expected to owe as of [July 1st] in full on the Maturity Date at the interest rate in effect 45 days prior to [July 1st] in substantially equal payments." Subsection 4(F) explains that the newly calculated monthly payment is capped at 7.5 percent more or less than the amount of the monthly payment during the year before.

¶7 Subsection 4(G) of the note is titled "Changes in [the] Unpaid Principal Due to Negative Amortization or Accelerated Amortization." Subsection 4(G) explains:

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly

payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad[d] the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess toward a reduction of the Note.

¶8 Subsection 7(B) of the note states, "If I do not pay the full amount of each monthly payment on the date it is due, I will be in default."

¶9 Section 22 of the deed provides, "If the default is not cured . . . Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law."

## II

¶10 In June 2007, Washington Mutual indorsed in blank,[1] sold, and deposited Bucci's loan into a loan trust titled "WaMu Mortgage Pass-Through Certificates Series 2007-OA6 Trust" (WaMu Trust).[2] As a result of the sale, the WaMu Trust owned and was the beneficiary of Bucci's note. Under the terms of the sale, the original trustee of the WaMu Trust was LaSalle Bank NA. Washington Mutual continued to service the note.

¶11 After Washington Mutual failed in September 2008, the Federal Deposit Insurance Corporation (FDIC) placed

---

[1] A note indorsed in blank is payable to the bearer and "may be negotiated by transfer of possession alone." RCW 62A.3-205(b).

[2] The parties refer to the pooled trust as either the "Loan Trust" or "WaMu Trust." We use "WaMu Trust" in this opinion.

the bank into receivership. The FDIC then sold Washington Mutual's assets to Chase.[3] Under the sale agreement, "[Chase] specifically purchase[d] all mortgage servicing rights and obligations of [Washington Mutual]." As of September 2008, Chase began servicing the note for the WaMu Trust.

¶12 In October 2008, LaSalle Bank NA merged into, and subsequently operated as part of, Bank of America NA (BofA). As of October 2008, BofA became trustee of the WaMu Trust and was the beneficiary of the note.[4]

¶13 On January 29, 2009, BofA executed a limited power of attorney in favor of Chase authorizing Chase to, among other things, complete a nonjudicial foreclosure and appoint a successor trustee to serve under the deed. Chase continued to service the loan and as its attorney-in-fact, held the note on behalf of the beneficiary BofA.

¶14 Bucci defaulted on the note in March 2009. In April 2009, Chase notified Bucci that he was in default. Chase's notification letter included contact information for its loan modification hotline.

¶15 On July 16, BofA, through Chase, recorded an appointment of successor trustee. The appointment named NWTS as successor trustee under the deed.

¶16 NWTS recorded the first notice of trustee's sale in King County on August 14, 2009, setting the sale for November 13, 2009. The trustee's sale was postponed and later discontinued. NWTS recorded a second notice of trustee's sale on July 8, 2010, setting the sale for October 8, 2010. The second sale was also discontinued.

---

[3] Purchase and Assumption Agreement between FDIC and Chase; *see also* FED. DEPOSIT INS. CORP., PURCHASE AND ASSUMPTION AGREEMENT (Sept. 25, 2008), https://www.fdic.gov/about/freedom/washington_mutual_p_and_a.pdf (same).

[4] The full name of the beneficiary was "Bank of America, National Association as successor by merger to LaSalle Bank NA as trustee for WaMu Pass-Through Certificates Series 2007-0A6 Trust." For simplicity we will refer to the beneficiary as "BofA."

¶17 On May 12, 2011, NWTS was notified that USB had succeeded BofA as trustee of the WaMu Trust. Consequently USB was the new beneficiary of the note.[5]

¶18 Almost two years later on March 12, 2013, NWTS sent Bucci a second notice of default. The notice identified the owner of the note as "U.S. Bank National Association, as Trustee, [of the WaMu Trust]."

¶19 In April 2013, Bucci elected to pursue foreclosure mediation through a referral from the Washington Department of Commerce. The referral identified the owner of the Note as "U.S. Bank National Association, as Trustee, [of the WaMu Trust]." Bucci unilaterally cancelled the mediation.

¶20 NWTS recorded the third notice of trustee's sale on June 25, 2013, and set the sale date for October 25, 2013. One day before the scheduled sale, NWTS received confirmation that USB was the deed's beneficiary. The third sale was postponed to January 24, 2014, but did not occur.

¶21 On August 1, 2013, SPS took over for Chase as the loan servicer for USB.

¶22 Bucci filed suit in August 2013, seeking declaratory judgment and injunctive relief to prevent the nonjudicial foreclosure and sale. The complaint alleged that all defendants were negligent and violated the deed of trust act (DTA), chapter 61.24 RCW; Washington's Consumer Protection Act, chapter 19.86 RCW; and their duties of good faith.

¶23 All the defendants moved for summary judgment. The trial court granted the defendants' motions and dismissed all of Bucci's claims. Subsequent to the dismissal, the trial court granted a motion on the merits previously filed by Chase seeking dismissal based on federal preemption. Bucci timely appealed both orders. We affirm.

---

[5] The full name of the beneficiary was "U.S. Bank National Association, as Trustee, successors in interest to Bank of America, National Association as Trustee as successor by merger to Lasalle Bank, National Association as Trustee for WaMu Mortgage Pass-Through Certificates Series 2007-0A6 Trust." For simplicity we refer to the beneficiary as "USB as trustee."

## ANALYSIS

■ ¶24 This court reviews summary judgment decisions de novo, engaging in the same inquiry as the trial court. *Michak v. Transnation Title Ins. Co.*, 148 Wn.2d 788, 794-95, 64 P.3d 22 (2003). Summary judgment is appropriate if, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party, no genuine issues of fact exist and the moving party is entitled to a judgment as a matter of law. *Michak*, 148 Wn.2d at 794-95. "A genuine issue of material fact exists if reasonable minds could differ about the facts controlling the outcome of the lawsuit." *Barkley v. GreenPoint Mortg. Funding, Inc.*, 190 Wn. App. 58, 65, 358 P.3d 1204 (2015), *review denied*, 184 Wn.2d 1036 (2016).

■ ¶25 Summary judgment "is subject to a burden-shifting scheme." *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). The moving party meets its initial burden by submitting evidence demonstrating that it is entitled to a judgment as a matter of law. *Ranger*, 164 Wn.2d at 552. The burden then shifts to the nonmoving party to set forth " 'specific facts which sufficiently rebut the moving party's contentions and disclose the existence of a genuine issue as to a material fact.' " *Ranger*, 164 Wn.2d at 552 (quoting *Meyer v. Univ. of Wash.*, 105 Wn.2d 847, 852, 719 P.2d 98 (1986)). To accomplish this, the nonmoving party " 'may not rely on speculation [or] argumentative assertions that unresolved factual issues remain.' " *Ranger*, 164 Wn.2d at 552 (alteration in original) (quoting *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986)).

I

■■ ¶26 Under the Uniform Commercial Code (UCC), Title 62A RCW, the "holder" of an instrument, including a promissory note, is the "person entitled to enforce" the

terms of the note. RCW 62A.3-301, -104(e). The holder of the note is the beneficiary of a deed of trust securing the note and is entitled to enforce the deed of trust through the nonjudicial foreclosure procedure set out in Washington's DTA. *Bain v. Metro. Mortg. Grp., Inc.*, 175 Wn.2d 83, 104, 285 P.3d 34 (2012).

¶27 USB sought dismissal of Bucci's claims on summary judgment, claiming that as the holder of the note, it was entitled to enforce the terms of the note. The trial court agreed and granted summary judgment in favor of USB. Bucci assigns three errors to the trial court's decision: (1) the court erred in accepting testimony and evidence offered by USB's attorney, (2) the note was not a "negotiable instrument" and therefore fell outside of the UCC, and (3) the court erred in weighing evidence. We disagree and address each argument in turn.

## A

¶28 Bucci argues the trial court erred in admitting a declaration from USB's attorney, J. Will Eidson. Bucci objects specifically to the statement in Eidson's declaration attaching a true and correct copy of the note and declaring that "[t]he current holder of the Note and Deed of Trust is U.S. Bank N.A., as trustee." Bucci argues that Eidson was prohibited from testifying by the Rules of Professional Conduct, the Rules of Evidence, and CR 56(e) because he lacked personal knowledge of whether USB was the holder of the note.

¶29 But whether Eidson's testimony was admissible is irrelevant because the declaration was not necessary to prove that USB was the holder of the note. USB did not rely on Eidson's declaration or the copy of the note; instead, at the summary judgment hearing USB offered the original note. As the trial court confirmed:

> For the purposes of the record and for clarity I am reviewing the adjustable rate note involving the property at 8102 155th

Avenue Southeast Newcastle, Washington 98059. A copy of which was previously provided.

There being no articulable basis to dispute authenticity, I would note that same on page 3 of 6 it appears identical to the one submitted. There are no modifications to the original thus far at page 4. There's the original signature. And the prepayment fee note addendum also made May 22, 2007. I didn't include the date, did I, -- which is also the date of the adjustable rate note. Also signed by the borrower.

Thank you, Counsel. The originals, as presented to the Court, are identical to the copies provided. I did have an opportunity to observe the original signature of Mr. [Bucci].[6]

██ ██ ¶30 Under the UCC, the "holder" of the note is "[t]he person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession." RCW 62A.1-201(b)(21)(A). The "[m]ere production of a note establishes prima facie authenticity and is sufficient to make a promissory note admissible." *United States v. Varner*, 13 F.3d 1503, 1509 (11th Cir. 1994) (citing *United States v. Carriger*, 592 F.2d 312, 316-17 (6th Cir. 1979)). USB produced the original note, indorsed in blank, for inspection by the trial court. This was sufficient to prove the status of USB as the holder of Bucci's note. *See Deutsche Bank Nat'l Tr. Co. v. Slotke*, 192 Wn. App. 166, 175-76, 367 P.3d 600 (2016).[7]

B

██ ¶31 Bucci argues next that a negative amortizing note is not a negotiable instrument under Washington's UCC because there must be a promise to pay "a fixed amount of money" and the note provides that the principal

---

[6] Report of Proceedings (Feb. 27, 2015) at 7.

[7] As stated in *Deustche Bank*, "We express no opinion whether this is the exclusive method for the holder of a note to prove its right to enforce the note." 192 Wn. App. at 175-76; *see, e.g., Barkley*, 190 Wn. App. at 66-68 (note and deed of trust admissible as business records pursuant to RCW 5.45.020).

may change depending on the borrower's payments and interest.[8] Bucci contends that because the note falls outside of the UCC, contract law applies and in order to enforce the note USB needs to establish their rights under common law contracts and demonstrate valid assignments and a chain of title from the original lender.

¶32 Under the UCC, a "'negotiable instrument' means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order." RCW 62A.3-104(a). Negotiability is determined from the face, the four corners, of the instrument at the time it is issued without reference to extrinsic facts. 5A RONALD A. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 3-104:13, at 115 (3d ed. 1994) (citing *Holsonback v. First State Bank of Albertville*, 394 So. 2d 381 (Ala. Civ. App. 1980)).

¶33 Bucci relies primarily on *Anderson v. Hoard*, 63 Wn.2d 290, 387 P.2d 73 (1963), to support his claim that the note is not negotiable because the principal may increase. Bucci's reliance on *Anderson* is misplaced. The promissory note in *Anderson* applied the debtor's installment payments first to the accrued interest, and then, "'at the option of the holder, . . . such advances as the holder may have made for taxes, assessments or insurance premiums and other charges on any property mortgaged or pledged to secure this note,'" and finally to the reduction of principal. *Anderson*, 63 Wn.2d at 291 (emphasis omitted). At the time of the *Anderson* decision, former RCW 62.01.001 (1955) required a negotiable instrument to "contain an unconditional promise or order to pay a *sum certain in money*." (Emphasis added.) Because the promissory note in *Anderson* provided for the repayment of unknown amounts of future taxes, assessments, insurance premiums, and other charges, the

---

[8] A year after Bucci executed the note, the Washington State Legislature passed legislation prohibiting a financial institution from making a residential mortgage loan with "any provisions that impose negative amortization." RCW 19.144.050 (effective June 12, 2008). In May 2007, however, a residential loan with negative amortization provisions was lawful.

court found that the note did not contain a promise to pay a sum certain and was therefore not negotiable. *Anderson*, 63 Wn.2d at 293-94.

■ ¶34 RCW 62.01.001 was subsequently repealed and replaced by the current definition of a "negotiable instrument" in RCW 62A.3-104(a).[9] Under the current definition, a " 'negotiable instrument' means an unconditional promise or order to pay a fixed amount of money, *with or without interest or other charges described in the promise or order*." RCW 62A.3-104(a) (emphasis added). Further, under RCW 62A.3-112(b), "[i]nterest may be stated in an instrument as a fixed or variable amount of money or it may be expressed as a fixed or variable rate or rates. *The amount or rate of interest may be stated or described in the instrument in any manner and may require reference to information not contained in the instrument*." (Emphasis added.) Thus, negotiability exists if the fixed amount can be determined from the face of the instrument, except for amounts of interest, for which reference to information not contained in the note is allowable.

■ ¶35 As Division Two of this court recently explained, "A reference to another writing does not of itself make the promise or order conditional. We analyze the

---

[9] Bucci also relies on brief passages in two law review articles to support the argument that a loan with a negative amortization feature is not negotiable. Neither article is persuasive. In the first, Elizabeth Renuart, *Uneasy Intersections: The Right To Foreclose and the U.C.C.*, 48 WAKE FOREST L. REV. 1205, 1231 (2013), the author relies on the unpublished California United States District Court order in *Ralston v. Mortgage Investors Group, Inc.*, No. C 08-536 JF (PVT), 2010 WL 321931, 2010 U.S. Dist. LEXIS 81989 (N.D. Cal. Aug. 12, 2010) for the proposition that inevitable negative amortization renders the actual principal amount uncertain. *Ralston* concerned a fraudulent omission claim under California law. It is not a UCC case and does not address whether a negative amortization feature renders a promissory note nonnegotiable.

In Kathleen C. Engel and Thomas J. Fitzpatrick IV, *Complexity, Complicity, and Liability up the Securitization Food Chain: Investor and Arranger Exposure to Consumer Claims*, 2 Harv. Bus. L. Rev. 345, 358 n.50 (2012), the authors state, "Arguably, loans with negative amortization could be for uncertain sums because the principal balance can increase over time." The authors provide no support for this claim other than a contrary authority in *Goss v. Trinity Savings & Loan Ass'n*, 1991 OK 19, 813 P.2d 492.

promissory notes' contents to determine whether the notes' holder could determine her or his rights, duties, and obligations with respect to the payment on the notes without having to examine any other documents." *Alpacas of Am., LLC v. Groome*, 179 Wn. App. 391, 397, 317 P.3d 1103 (2014) (citing RCWA 62A.3-106 cmt. 1). Indeed, as explained in comment 1 of RCWA 62A.3-106, the rights, duties, and obligations of the transferee—not the current balance— must be found on the face of instrument:

> The rationale is that the holder of a negotiable instrument should not be required to examine another document to determine rights with respect to payment. But subsection (b)(i) permits reference to a separate writing for information with respect to collateral, prepayment, or acceleration.
>
> Many notes issued in commercial transactions are secured by collateral, are subject to acceleration in the event of default, or are subject to prepayment, or acceleration does not prevent the note from being an instrument if the statement is in the note itself.

RCWA 62A.3-106 cmt. 1.

¶36 The note here describes Bucci's obligations on its face: "I promise to pay U.S. $1,530,000.00 plus any amounts added in accordance with Section 4(G) below, (this amount called 'Principal'), plus interest, to the order of the Lender." Bucci's note fully discloses how interest accrual may result in negative amortization, depending on the amount Bucci chooses to make as a monthly payment. Negative amortization occurs under the note only if Bucci chooses not to pay the full amount of interest due each month and only if the monthly payment is insufficient to cover the accrued interest. Bucci's note provides for a monthly payment, but Bucci is not limited to paying only the monthly payment amount. The note expressly permits Bucci to make prepayments toward the principal.

¶37 RCW 62A.3-104(a) defines a "negotiable instrument" as "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges

described in the promise or order." Because Bucci's note contains an unconditional promise to pay a fixed amount of $1.53 million plus any amounts added in accordance with the provisions in subsection 4(G) of the note, it is a negotiable instrument as defined in RCW 62A.3-104(a).

## C

¶38 Bucci next argues that in granting USB's motion for summary judgment, the trial court erroneously weighed the credibility of the parties' evidence. Specifically, Bucci contends that the trial court weighed evidence concerning whether USB was the holder of the note and beneficiary of the deed. We disagree.

¶39 The UCC sets forth the rules for challenging the originality of a note. A note is original if it contains the original signature of the maker. Under RCW 62A.3-308(a), the validity of signatures are admitted unless specifically denied:

> In an action with respect to an instrument, the authenticity of, and authority to make, *each signature on the instrument is admitted unless specifically denied in the pleadings.* If the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity, but *the signature is presumed to be authentic and authorized* unless the action is to enforce the liability of the purported signer and the signer is dead or incompetent at the time of trial of the issue of validity of the signature.

(Emphasis added.) Here, USB produced the original of the note before the trial court and the trial court confirmed it contained Bucci's original signature. Bucci did not dispute the originality of the note or the authenticity of his signature on the note. Thus, the validity of the signatures is admitted.

¶40 Under RCW 62A.3-308(b), if the validity of the signatures is admitted, then so long as the plaintiff producing the instrument is the "holder" of the instrument under

RCW 62A.3-301, the plaintiff is "entitled to payment" unless "the defendant proves a defense or claim in recoupment." RCW 62A.3-308(b). Here, USB was the holder of the original note and the signature on the note was not disputed.

¶41 The only defenses raised by Bucci in response to USB's offer of the original note were that (1) the trial court either erred in admitting Eidson's declaration and evidence and (2) the note was not negotiable. As discussed above, both of Bucci's defenses fail as a matter of law. The trial court did not err in weighing the evidence. Because Bucci failed to introduce valid evidence disputing that USB was the holder of the original note, there was no evidence for the trial court to weigh. Summary judgment in favor of USB is affirmed.

¶42 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and the remainder, having no precedential value, shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

APPELWICK and DWYER, JJ., concur.

Reconsideration denied January 30, 2017.

Review denied at 188 Wn.2d 1012 (2017).